Good morning, your Honor. I'm Eric Slotkin. I'm the advocate on the Rose-Eckert case. This is a social security matter. The decision of the Administrative Law Judge is not free of the OIRA. The attorneys of the Administrative Law Judge have supported by substantial evidence of record that the following agreement is appropriate. The record shows that Ms. Eckert is not profiling. When you say remand is appropriate, remand is true. That is one of the remedies where C.K. would represent them to the district courts. I believe we did, your Honor, identify and have people back and look at the remedy. But while that's one of those remedies. One of the things I just felt like, I mean, I've had you in front of me in many, many different cases. And I would say, expert counsel can do good work. So I'm looking at what I've gotten in front of me when I'm looking at one of your cases. And this one I didn't see credit as proof before the district courts. So I said, my goodness, this is another different kind of case for this couple. So if we look at the real issues, those are the ones we should be looking at. Thank you, your Honor. You make me pleasure that a remand for the first proceedings, at this point, would not be an inappropriate relief in this matter. Okay. So Ms. Eckert has a number of physical impairments that preclude her ability, or at least negatively impact her ability to perform work-related activities. And as you are aware, the training position has set forth a number of restrictions that were apparently rejected by the administrative law judge. And it's those reasons that we ask you to look at to find that they are not supported by substantial evidence of record, and that the judge did not clearly imply any regulations in weighing medical source opinion evidence. Also, we have- Are you talking then about the opinions of the experts? I'm talking to- Well, yes. I mean, I'm trying to figure out what issue you're really getting to here. And I'm talking about the reason that it's not in your client's statements. You're talking about the reason that you think the opinions are in your- So, Your Honor, one of the reasons why further proceedings would in fact be the remedy in this particular matter is the administrative law judge gave significant weight to non-training physician opinion and they rejected the training physician opinion. In weighing the opinion of the non-training physician, specifically Dr. Jones, we did note that he used some very unusual terminology in his report. He says that Clayton was able to get up and down without human assistance. That's an odd phrase to see written as opposed to without assistance. And quite frankly, I've been seeing it on other reports that he keeps saying without human assistance. Also, Dr. Jones says greater motion is inadequate. He's supposed to give us the actual ranges of motion so we can determine if it's limited and whether that's consistent with the evidence of record. Now, he is the discipline of the issue. We noted that Dr. Jones reported non-compliant social security requirements. In addition to those that I briefly mentioned, it doesn't appear as if he was given the necessary background information. He doesn't comment on the objective data showing mild and flat mental surfaces of the cord. I'll just mention the C-rings. These are very significant findings. And the regulations say that the claimant has the right to request disobedience, further develop the record, and question these physicians on their oath. And in the case of paralysis of Richardson, the Supreme Court actually indicated that if the claimant makes a timely request, as did Ms. Eckert, that if it's not directed, then that report is likely not substantial evidence. And so when we look at that, I guess my worry about Dr. Jones is this. It seems to me that the ALGA gives the opinion more weight than they give the treating physician, which I always look at kind of as camps. However, on that, then I look at what did the ALGA look at? Well, to me, Dr. Jones evaluated Rose Eckert. Dr. Jones reviewed the medical records. And then after that evaluation, Dr. Jones decided what Dr. Jones decided. And then the ALGA says, Well, it's supported by the record as a whole. And I guess I'm having a tough time on bystander review suggesting how I can say that's wrong. Well, if he doesn't, if Dr. Jones had not evaluated, had not reviewed all the medical records, had not gone through what Dr. Jones needed to, well, then I could give Dr. Jones a few cups. But I couldn't. And when the ALGA says it's supported by the record as a whole, then I have trouble. So I would suggest, John, that there's no indication why the actual records Dr. Jones reviewed. He doesn't currently count them. I'd have to say I've looked at a 2010 MRI and maybe two particular treatment notes. And it's very common that these physicians don't get an entire record. And that's one of the reasons why. The ALGA is, I mean, what Dr. Jones looked at, he looked at, Dr. Jones looked at. The thing that worries me about that, now the ALGA looks at what Dr. Jones has suggested. This is based on his evaluation and his reviewing of the medical records, which are now saying he didn't look at all. Then he says, the ALGA says, But it's supported by the record as a whole. So without aberrating Dr. Jones' opinion, the whole record should be reviewed. I understand your question, Your Honor. So that conclusion isn't supported by citations of substantial evidence. In particular, Ms. Eckert has a C56 disc that flattens the cord. That's a very significant finding. She has bilateral narrowing. She has a serious endoscleral cord. She has a neurosurgical evaluation where they recommended that she have a fusion surgery. The commissioner argues that, well, one neurologist said, Yes, you should have a surgery, and another neurologist says, No, you shouldn't have a surgery. But that second neurologist doesn't really say, No, you shouldn't have a surgery. What the second neurologist said is, Look, I'm going to say a new MRI. He goes, What is a new MRI? And he says, Well, this is very poor quality. I cannot get any useful information from this particular MRI. I don't see anything of significance. But it's not a good study. So he orders an EMG. The EMG comes back as positive. And so now they want to defer the testing to see if she's eligible for that surgery. And she says, Hey, listen, there's a substantial risk of paralysis if I undergo next surgery. We don't want it. And so she didn't have it. But that doesn't mean that the neurologist did not think it was warranted. One neurologist absolutely said, Yes, you should have it. And she went to the second opinion. And the other doctor said, Look, you have positive findings. I want to do more testing. And she says, No, I'm not going to have the surgery so I have the testing. That is not a doctor who says, There's nothing wrong with this particular individual. And that's the very big fact to you. I know a lot of people who don't want to have surgery. To what extent do you think that this, that the ALJ, which is the decision that's based on her not getting surgery or not wanting another MRI? I think the judge put a lot of weight into that because the way this particular judge worded his decision is everything was mere or meager or mild. And... Well, are you claiming... The impression is... Are you claiming that there's a regulation, 404 or 1530, that talks about following examples and a good reason for not following treatment, some form of treatment, because of its magnitude that is open-arm surgery, the usual nature, such as organ transplant, or other reasons very risky for you? Are you claiming that this one falls into that? Absolutely. You found out that the surgery that was being recommended could cause paralysis, could cause additional opportunity deficits, that actually could even cause death. So, yeah, the enthusiasm. Now, when we look at the opinion of the treating physician, I'd like to go through some specific reasons why the administrative law judge rejected it, because those reasons are not supported by substantial evidence. And... Well, what he said was it was brief, blissfully inadequately supported by the fact that... That is what the judge wrote. That is what he wrote. And he had a lot of reasons to say that, five or six reasons about that. Do you want to go through them? Yes, sir. OK. So, you did fill out a checklist. Correct. There was no explanation why the limitations existed. Well, that's 100% correct, because... Well, in the checklist, there's not much there. On the checklist itself, there's a portion where it says that the opinion is basically the objective data diagnostic findings found by the physician as well as the specialist noted in the treatment records. And then in those treatment records, we have notations of not only the subjective findings that I mentioned, including the births of MRIs and nerve conduction studies, but there's failed epidural infections in nerve blocks and medications and ongoing pain. So, based on Garrison, when we look at the record as a whole, that opinion is fully supported. There's a fairly neurological evaluation for decompany from nerve room involvement. The other thing the administrative logic said is that if the physician rendered an opinion, then they should be served for determination by the commissioner. The commissioner... Before we get too far about that, yeah, you say it's in the record, but he didn't explain which clinical diagnostic findings she bases her conclusions on. Correct. And the ALJ doesn't need to accept opinion of physician, including the treating physician, if the opinion is brief or conclusory or inadequately supported. So here we have somebody who says, I'm going to check the box. I'm going to say, look at all I've got in the record that supports the box. It doesn't tell what part of the record supports the box. The law in these units, the judge can be tempted to say it's brief, conclusory, or inadequately... It's pretty brief, conclusive, and electric. Inadequately explained when we don't even know what part of the record. That's like what they used to accuse me of when I was insurance defense counsel. Here, the records are out in the potato cellar. Go find them. I say that's not enough for discovery. You're omitting the part where it says supported by the record and the physician opinion. There's no question that there is objective data with MRIs and nerve conduction studies, and there's a series in the spine, and this court's flattening. And to say that this opinion doesn't consider that evidence would not be supported by any evidence at all when the treating doctor says, no, I considered these records. I considered the opinions of specialists because we can't then say, well, but you have to list it out in detail because it would be dope looking if we had those records. Here, the question is are those limitations supported? And when we look at the record as a whole, there's nothing here that contradicts those particular findings of the treating physician other than an opinion from the examining physician, which was already discussed. They do admit, I believe they concede, that there was error when the judge found that it was on an opinion reserved for determination by the commissioner, as it's contrary to 96-5P. The LT says it's inconsistent with the medical evidence, but neither tells us which limitation's inconsistent, which would piece the medical evidence, and never brings that conclusion to the actual findings supporting that decision, and that's very problematic. The ALJ says the doctor just recorded Ms. Everett's answers, but the record doesn't show that. It shows the doctor filled out, gave her opinion, and on one answer, she wrote this one's per patient report. It doesn't impugn or assume that. Look where it is. I mean, it was very specific. I see I have about 45 seconds left, and I would like to reserve some time for rebuttal. Mr. Lewin, take your opportunity. Thank you. Representing Mary Hill. Good morning. I'm Martha Bowden, and I'm here on behalf of the Acting Commissioner of Social Security. First, before I get started on what I wanted to say, I would like to address a few things that counsel has stated in his presentation. Just to put this to bed, you're right about the credit is due. Plaintiffs did not argue that before the district court. They did not ask for a counsel for very specific reasons for doing that. He wanted more testimony. He had requested subpoenas, and the ALJ denied that request, and so he objected to some of the evidence because he couldn't cross examine witnesses, so he asked for further proceedings for that purpose. So he is asking for further proceedings up until his brief to you folks. Right. So I want to talk about the training position's opinion, doctor percentage. Counsel relies heavily on doctor percentages opinion to say that the ALJ's decision was not supported by substantial evidence. But when you look at it in the context of the record as a whole, doctor percentages opinion, she was inconsistent with all the other medical opinions in the record. And she was inconsistent with, if you think about it, her opinion was made in August of 2012. The relevant timeframe here is November of 2010 when Ms. Rosehecker claimed that she became disabled and unable to work, and it goes until the ALJ's decision in September of 2012. So it's almost a two-year period we're talking about here that's relevant. And doctor percentage gave her opinion one month before the ALJ decision. Right at the end, that opinion was inconsistent with the other evidence in the record. She, if you look at the other examination findings, excuse me, they're all in 2010 and 2011. The exam findings are relatively benign. They're limited to tenderness and palpation of her neck and back. There were a couple of notations in 2010 through 2012 where Ms. Rosehecker expressed pain when her neck was rotated during an examination. In June 2012, there was another finding in one place, I think it was by a neurologist, that she had diminished sensation or feeling in her right pinky finger. Those are the extent of the findings on examination. Doctor percentage examined her patients several times as well, and her findings were rather limited as well. She said there was some upper trapezius spasms, meaning her back was doing too. And then right here in late, in mid-July, right before the ALJ's decision, she noted that there were diminished reflexes in Ms. Rosehecker's left arm, not her right, when her right arm and hand is where she says the issues are occurring. So those are the examination findings. I went through the record and I looked at every one. There are about 15 exams in this record, and they are quite benign. I think all support what the doctor percentage was marked was that it all supports the limitations that she outlined in her opinion. And also... I was a little surprised that the ALJ signed on white to the opinion saying that they consistently revealed because they were inconsistent with their own treatment notes. Yes, and of course that is a valid reason for rejecting it. It is, but I was trying to figure out whether it really was inconsistent. Well, I submit to you that they were inconsistent because what she said was that Ms. Rosehecker was unable to sustain full-time employment of any kind after she could only stand or walk for two hours a day. And if you look at her treatment notes, she has examination findings that are a spasm in her upper back. And then she had in one of her... A couple of her exams showed almost full motor function, four out of five on her right arm. And then this diminished reflexes in the middle of 2012. That was it. Everything else was fine. She didn't mention that she had difficulty walking. She didn't mention that she looked like she was in significant pain. Well, if I read the notes, the notes indicate neck spasms on several occasions. The notes indicate the doctor that she had increased neck pain and diminished reflexes. That seems to support what the doctor said. Well, the ALJ felt that that wasn't significant enough to match with limitations that Dr. Resnick concluded that the claimant had. So in this case, as in every case, the ALJ is a fact finder. And it's the role of the ALJ to look at evidence that's conflicting, to resolve conflicts, to weigh the evidence, and to make findings. And it was a reasonable interpretation of that evidence that having a stiff upper back and diminished reflexes in your arms doesn't equate to not being able to sustain work at any level. She did complain of insomnia, right? She did complain of insomnia. The ALJ defined that that was significant to find her disabled. Well, what I'm working on is the opinion that our bench is inconsistent with speech. I guess I'm trying to figure out what the inconsistency is. Well, I think that I said it to you, that the ALJ found that those examination findings and those clinical exam findings were not significant enough to warrant the limitations that Dr. Resnick identified. And also, I should note that it was proper, the ALJ was entitled to rely on the opinion of Dr. Jones, even though he was a commentary doctor. He was an examining physician. And the claimant makes, or excuse me, counsel makes an argument that the MRI was such significant evidence that to not address it or to not consider it is just an error. But in fact, Dr. Jones had that MRI record, and so did the other reviewing doctors. He saw it, he described it, and then he said, despite that, based on the nine clinical findings on examination, his observations that Ms. Roedzecker was able to walk very normally, even though she said she had difficulty walking, she was able to change positions without difficulty on her own, and she was able to get on and off the examination table with good assistance. I know he said, without human assistance. I haven't heard that phrase before. I know what that means. I want to help her get on or off the exam table. She was able to do it on her own. Those findings, with the MRI report and the couple of x-rays as well, Dr. Jones found that Ms. Roedzecker was able to see more at the light level, and the ALJ accepted that opinion, and he adopted it in his RFC assessment. What do you think of that? What is your view of the significance of declining to have neck surgery? Well, I know that the ALJ did not discuss that as a factor that he thought would not diminish her credibility. I don't think anyone is not afraid to have surgery, and that's understandable. I think it is, though. I think it is. If you look at the fact that she was also offered to have her arm immobilized as a potential treatment, it was also offered to her and recommended that she get a follow-up MRI. There had been one in 2010 and one in 2012. Dr. Jones saw the 2010 one, and then the neurologist saw the 2012 one, and found nothing of significance. But they wanted her to get another one to see if there had been any changes. So you let her open up an MRI? She did. I think she had an open MRI in 2012. They wanted her to get a follow-up. I think to see if there had been any changes. Those first two were relatively similar. And she declined because she said she was claustrophobic. So I think, you know, are we all? So I think if MRIs are pretty fun and they have medication for that, if you're really in pain, it makes sense that you would want to get out of pain and you would do anything reasonable to get there. But like I said, the ALJ did not diminish her credibility because she didn't have that surgery because she was afraid of it. My worry is that this case boils down to, do you believe Mercedes or do you believe Jones? Right. And so I really was going through then the reasons that ALJ rejected Mercedes' opinion and likening it then to what the ALJ did as it relates to Jones. One thing that was of some concern to me was one of the reasons they say they could, if you will, reject Mercedes' opinion was it disagreed with Jones. Though I'm not sure it was Jones. It seems to me in context it was Jones. It's kind of crazy. That is a good reason. Why is that a good reason? What case comes to your mind? There is a case that says that. I mean, you're making a decision whether it's one or the other, and because it disagrees with the one you like, that's a good reason? In a law, as you're supposed to be, you have to be waiting to the treating physician. Well, the physician does generally give more weight to the treating physician's opinion, but the treating relationship is just one factor of any that they're supposed to under the recommendations considered. Others are supportability and consistency with other evidence, specialization or other factors like familiarity with the disability program. The cases don't say that. The ALJ always gives more weight to the treating person. It's not a hard and fast rule. There are many factors that go into it in here. And you hit this predictive uprooting reason. That's right. The reasons for discrediting a physician's opinion need to be specific and legitimate. And, well, because it disagrees with another physician, is a good reason. It is its own. By that, I'm saying that a physician's opinion, if it is based on independent findings and different conclusions, is substantial evidence for ALJ to discount a treating source's opinion. Okay, I have the case. The name is T. We're going to look while you guys report. Do you want to ask me another question? I don't know what the case is. I've not read it. It must be a different, somebody coming in with another reason. But I wanted to talk to you about it because it worries me just a little bit. We've talked about the office notes. We've talked about it. We've talked about Jon Jones. And because you don't agree with Jones, I'm going to put you down. We've talked about whether the records really reflect what the opinion suggests. And then he did lose weight, the opinion, because he opined that Roesiger was unable to work at the level of substantial gainful activity, which is an issue reserved to the commissioner, right? That's right. The issue of, the ultimate issue of disability is an issue reserved to the commissioner. And it was specifically legitimate reason to discount that portion of this statement. And I'm sorry to interrupt, but I found the case. It's born in the Asteroom, and it's 495 F. 3rd, 625, and the year was 2007. And it stands for the proposition that when an examining physician provides independent medical findings that differ from the findings of a treating physician, that finding could constitute substantial evidence for rejecting a treating physician's opinion. So the ALJ gave five or six reasons. This was one. I also think I've discussed the overall record to show you that the examination findings weren't at that significant here. Also, even though counsel argues that the MRI was significant in what could compel a finding of disability, the neurologist and Dr. Jones both reviewed the MRI and found that the claimant was able to work at the light level sustained. Other issues you want to address? One issue that has not been raised specifically this morning, but was briefed by folks at counsel, was that in 2008, he applied the case of Brown and Hunter to say that the credibility and determination in this case was not specific. He argues that ALJ was not so general. It did quite a bit of work. And that's not true. This is an ALJ decision where ALJ points out what testimony that Ms. Rose-Eckert gave and exactly what evidence does not support it. So I'll give you a couple of examples. I won't be late, right, because we only have a minute here. But he talked about her testimony that she had difficulty walking. And he showed a note at ER 348, Dr. Jones, saying that she walked with a normal gait. He mentioned her complaints with neck pain, who was so severe that she couldn't work or do much of anything. And he showed her exactly what evidence didn't support that. The MRI showing only arthritic changes, according to the neurologist. The neurologist's evaluation is saying that she had just mild stenosis or narrowing of her vertebra. Dr. Hamlin's exam, which only showed near normal range of motion, and she had tenderness. I can go on. There are lots of data points that he gave, very specific evidence, showing exactly why he did not fully credit to her statements that she had difficulty walking and she was in so much pain that she was unable to work. Thank you. Please, sir. All right. Thank you so much, Mark. Thank you so much. Thank you. I just want to make a point here. First, I'd like to address the counsel's point that the treating physician rendered her opinion towards the end of the treatment period that was before the administrative audit. That goes to show that this particular doctor has the injury record. And that is a factor that would weigh in favor of the OECD. The entire record is because it was at the end of the run. OCCC on the records from the specialist that people claim it's been referred to is meddling. But she's obviously been communicating, and it's noted in her records, what the specialists have been advising the claimant. The other point I wanted to point out, when we talk about our credibility, there is no suggestion of exaggeration. So, as a matter of fact, I was looking through this form that she pulls out, but it doesn't say what she's relying upon. Yeah, but then she's indicated that she's relying upon the records that she's reviewed and the treatment. And this is also with regard to what she actually relied upon. In terms of relying upon the status of that test, we don't know as much. But at the end of the same token, I didn't say Dr. Jones doesn't agree that he refers to me to be treating records. Also, what's concerning that I didn't get to mention yet was the fact that we have a claimant examiner who writes to at least one doctor, affirmed by telling the doctor what's right. I mean, how do you get away with that? And so let's talk to these doctors. Let's find out what's going on here. What are they basing their opinions on? But getting back to the credibility analysis, without exaggeration or malingering, the commissioner is taking the position that there is a disconnect between limitation in walking and a normal gain. There is no disconnect. The claimant has the searings, degenerative disease, cord flattening, a head weighs about 10 pounds, and it sits right there on the spinal cord. You may be able to walk normal without an abnormal gain, but that's going to cause pain as your gain goes on, and it's going to affect the amount of joint that you could be on your feet. Activities put pressure on the spinal cord. They put pressure on the cervical area. Individuals need to rest and lie down during the day, and that's what she testified to, and there is nothing in this judge's decision that explains why those particular complaints were rejected. He did not link his findings to those limitations in that the legal evidence discussed in the government. Thank you. Thank you. Thank you both, counselors, for your work. 15-16148. Prosecutor versus Perry Hill is admitted.
judges: Schroeder, N.R. Smith, Piersol